IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FRANKS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEREMY A. FRANKS, APPELLANT.

Filed October 8, 2019.    No. A-18-1026.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Thomas P. Strigenz, Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Jeremy A. Franks appeals from his convictions and sentences in the district court for Sarpy County, following a bench trial, for one count of first degree sexual assault and two counts of third degree domestic assault. On appeal, he assigns error to the sufficiency of the evidence to sustain his conviction for sexual assault and argues that the court imposed an excessive sentence for that conviction. He also argues that he received ineffective assistance of trial counsel in various regards. We affirm his convictions and sentences.

## BACKGROUND

This case arises out of incidents occurring in July 2016 between Franks and his then girlfriend, K.K. On August 10, 2017, the State filed an information in the district court, charging Franks with one count of first degree sexual assault in violation of Neb. Rev. Stat. § 28-319(1)(a)(b) (Reissue 2016), a Class II felony; two counts of third degree domestic assault in

violation of Neb. Rev. Stat. § 28-323(1)(a)(b) (Reissue 2016), both Class I misdemeanors; and one count of second degree false imprisonment in violation of Neb. Rev. Stat. § 28-315 (Reissue 2016), a Class I misdemeanor. On the day of Franks' trial, the State filed an amended information, modifying the domestic assault charges to allege only that Franks intentionally and knowingly caused bodily injury to K.K. and to remove the allegations under § 28-323(1)(b) that he had threatened her with imminent bodily injury. The court also granted a motion by the State at the start of trial to dismiss the false imprisonment charge.

A bench trial was held on June 21, 2018. The State presented testimony from K.K., her brother's wife, and a law enforcement officer who investigated the case. The district court received exhibits offered by the State, including photographs depicting K.K.'s bruising and swelling following the assault by Franks, copies of surveillance video from outside Franks' residence, nurse's notes from K.K.'s visit to a medical provider following the incident, a corset that was worn by K.K. on July 9, 2016, a written statement by Franks to law enforcement dated July 18, certain social media posts by Franks and K.K., and a medical record from Franks' hospitalization prior to the events in question. Franks did not testify and rested without presenting any evidence. We summarize the trial evidence below.

K.K. and Franks began dating in the fall of 2013. At some point, they became engaged, and they planned to be married on July 9, 2016. Prior to the wedding date, Franks was hospitalized from July 1 to 7 for diverticulitis. Upon Franks' discharge from the hospital on July 7, K.K. drove Franks home. According to K.K., Franks was not bedridden at that time and was able to move around freely. When K.K. returned to Franks' residence later that day, she observed that the lawn appeared to have been mowed. She denied having mowed the lawn herself. A July 7 social media post by Franks referred to him cleaning his house and mowing three neighbors' lawns.

K.K. saw Franks again on July 8, 2016, at which time they had a verbal argument. According to K.K., Franks became angry because she did not bring her children over to help clean Franks' house. K.K. told Franks she did not want her children to come over because "he was in such a bad mood," and Franks responded by punching K.K. "full force" in the right leg. K.K. testified that she experienced "[m]assive pain" and had trouble walking after this incident.

According to K.K., the wedding ceremony on July 9, 2016, and reception that followed were largely uneventful. After the reception, Franks and K.K. joined a group of friends and family at a bar. According to K.K., both she and Franks consumed alcohol on July 9. She testified that she consumed four glasses of wine and one shot at the reception and a "little bit less" than one beer and one shot at the bar. She testified that Franks consumed "hard alcohol" at the reception, although she was not sure exactly what he was drinking. She did not remember whether Franks consumed any alcohol at the bar. Franks and K.K. agreed to spend an hour at the bar, and she testified that after an hour, he became increasingly upset at her for taking too long to leave. She testified that Franks yelled at her throughout the 10-minute car ride back to his residence, telling her that she was "disrespectful, stupid, and ignorant," that she "had no feelings for him," and that she "was rude."

After they arrived at Franks' house, K.K., who was still wearing her wedding dress, decided to return to her own residence, testifying that she was "fearful that because he was so upset with [her] that it was going to escalate." K.K. did not have a vehicle at Franks' house and had only

walked "about four houses away" before she sat down on the sidewalk and started crying out of fear for what her future was going to be like. K.K. testified that while she was sitting there, Franks drove up, grabbed her, and forced her into his car. When he did so, she heard "a bunch of the stitching in the wedding dress start to crack and break." They returned to Franks' house, and K.K. testified that after walking into the doorway, Franks grabbed her by the hair and instructed her to go upstairs. According to K.K., while she was going up the stairs, Franks pushed her a few times, and her next memory was of being in Franks' bedroom.

K.K. then described events occurring in Franks' bedroom. She remembered Franks shaking her and slamming her into a four-post bed, striking the back of her neck, throwing her to the floor, and repeatedly punching her head with a closed fist, all of which caused her pain. Franks yelled at her and ripped the pearl necklace, which had previously belonged to her deceased mother, from her neck, breaking it in the process. Then he placed one hand over her mouth and held her nose closed with the other hand, causing her to struggle to breathe. K.K. "acted like" she had passed out, hoping that Franks would leave her alone. Franks then released his grip on her nose and mouth. At that point, K.K. was face down on the bed, and she remembers Franks removing her wedding dress. She did not try to stop him from doing so because she did not want him to know that she was awake; she was still hoping he would "just leave [her] alone." Franks then removed K.K.'s corset, becoming frustrated in the process and "rip[ing] it the rest of the way off" and tearing several of the lower eyelets in the process.

At that point, K.K. realized Franks was not going to leave her alone and that he was going to have sex with her. As Franks was ripping the corset open, K.K. was gripping the garment above her breasts and holding it to her body. After Franks tore the corset open, K.K. stood up and told him that she did not want to have sex with him. According to K.K., Franks laughed at her, yanked the corset away from her, exposing her breasts, grabbed her under her arms, and threw her on the bed. Franks then climbed on top of her and penetrated her vagina with his penis. Between the point when K.K. verbally informed Franks that she did not want to have sex with him and when he sexually penetrated her, K.K. never communicated to Franks that she had changed her mind. K.K. stopped resisting Franks physically after he threw her on the bed out of fear of more physical abuse. The following morning, July 10, 2016, the back of K.K.'s neck was swollen and painful, and she noticed bruises all over her body. Photographs taken by law enforcement after K.K. reported the above events and the nurse's notes from her visit to a medical provider confirm that she was covered in bruises.

On July 11, 2016, K.K. and Franks argued about text messages allegedly showing that Franks was having sexual relations with another woman. According to K.K., when she confronted Franks about the messages, he told her to "get the F out of his house" and to give back the wedding ring. K.K. left and went to a friend's house. K.K. told the friend, who noticed the bruises on K.K.'s body, about the abuse, and the friend encouraged her "to tell somebody." While talking to the friend, K.K. received a phone call from her brother and informed him of the abuse. K.K. subsequently went to her brother's house, where she received a phone call from Franks. K.K. turned on the speaker phone function during the call, and both K.K. and her brother's wife, who was present, testified to hearing Franks admit to beating K.K. K.K. testified that her brother's wife then called the police. The testimony of the brother's wife was consistent with K.K.'s testimony.

K.K. first disclosed that she was sexually assaulted by Franks while talking to a sheriff's deputy on July 11, 2016. K.K. spoke to law enforcement again the following day at her apartment, and on July 13, law enforcement documented her bruising and swelling. K.K. testified that, other than the bruise she received on her leg on July 8, the bruises depicted in the photographs were all the result of the assault that took place at Franks' home following the wedding ceremony. She went to the hospital on July 14 to be evaluated for the pain in the back of her neck.

An investigator with Sarpy County Sheriff's Office testified about her investigation in this case. During her investigation, she met with both K.K. and Franks. In the oral and written statements provided by Franks, he described his medical and physical condition at the time of the incidents in question and set forth his version of events, which included his assertions that K.K. assaulted him, smashed her head on the bed post several times, lost her balance and fell back "dead weight" into the dresser, and punched "her own face & head about 20 times." In his written statement, Franks indicated that he "was very sober and in extreme pain and discomfort on that night" and that his condition was such that "he could never have engaged in anything physical with [K.K.] that night." Franks also indicated that he could barely hold his own weight up from lack of energy and being very sick. The investigator obtained surveillance footage from outside the residence for the period from July 7 to 10, 2016. The surveillance footage shows Franks mowing the yard and performing other tasks without apparent difficulty from July 7 to 9, K.K. walking with a limp when leaving the residence on July 8, and various interactions between Franks and K.K. outside the residence between July 7 and 10.

After the parties rested, the district court called for written closing arguments and took the case under advisement. On June 28, 2019, the court announced its verdict, finding Franks guilty of first degree sexual assault and both counts of third degree domestic assault. In doing so, the court explicitly found that K.K.'s testimony had been credible. The court scheduled a sentencing hearing and also ordered a presentence investigation.

At the sentencing hearing, the district court heard argument from counsel for both parties. Franks was given the opportunity to speak to the court as well, and he initially declined. However, after K.K. spoke to the court, urging the imposition of a lengthy sentence, Franks changed his mind and made a statement, during which he proclaimed his innocence, argued that K.K. had assaulted him, and asserted that he was the true victim. Franks expressed similar sentiments in a lengthy written statement to the court found in the presentence investigation report. The court then sentenced Franks to 40-50 years in prison for first degree sexual assault and consecutive terms of 1 year each for the third degree domestic assault convictions. The court gave Franks credit for 484 days of time already served.

ASSIGNMENTS OF ERROR

Franks asserts, reordered, that (1) the district court's finding of guilt was not supported by the evidence, (2) the court abused its discretion by imposing an excessive sentence, and (3) his trial counsel was ineffective based on his refusal to investigate both exonerating and impeachment evidence and failure to make evidentiary objections.

With respect to Franks' third assignment of error, we note the Nebraska Supreme Court's holding in April 2019, that assignments of error on direct appeal regarding ineffective assistance

of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In *Mrza*, the Supreme Court scoured the brief and inferred specific assignments of error, but stated it would not do so in the future. Because Franks' assignment of error as to ineffective assistance of counsel does not conform to this rule and the brief in this case postdates the release of *Mrza*, we do not address Franks' third assignment of error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019).

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Sinkey*, 303 Neb. 345, 929 N.W.2d 35 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

*Sufficiency of Evidence.*

Franks asserts that the district court's finding of guilt was not supported by the evidence. He argues, with respect to his conviction for first degree sexual assault, that there was no credible evidence in the record to prove K.K.'s lack of consent beyond a reasonable doubt. Franks does not argue that the evidence was insufficient to show that he subjected K.K. to sexual penetration, and he does not challenge the sufficiency of the evidence to convict him of two counts of third degree domestic assault.

First degree sexual assault is defined under § 28-319(1) as follows:

Any person who subjects another person to sexual penetration (a) without the consent of the victim, (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct, or (c) when the actor is nineteen years of age or older and the victim is at least twelve but less than sixteen years of age is guilty of sexual assault in the first degree.

Further relevant terms are defined under Neb. Rev. Stat. § 28-318 (Reissue 2016) as follows:

(8) Without consent means:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given,

was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so; and

(9) Force or threat of force means (a) the use of physical force which overcomes the victim's resistance or (b) the threat of physical force, express or implied, against the victim or a third person that places the victim in fear of death or in fear of serious personal injury to the victim or a third person where the victim reasonably believes that the actor has the present or future ability to execute the threat.

The evidence shows that K.K. expressed a lack of consent to Franks' sexual penetration of her both through her words and conduct and that she was compelled to submit due to his use of force or threat of force or coercion. At trial, K.K. testified that after Franks beat and suffocated her, she verbally expressed her unwillingness to have sex to Franks before he penetrated her vagina with his penis. She did not attempt to prevent Franks from removing her wedding dress because she did not want him to know she was awake after the suffocation, and she was hoping he would leave her alone. Franks became frustrated while removing K.K.'s corset and ripped it. At that point, K.K. realized Franks was not going to leave her alone and was going to have sex with her. K.K. gripped the corset to her body, stood up, and told Franks she did not want to have sex. Franks laughed, grabbed the corset out of her hands, threw her on the bed, and proceeded to sexually penetrate her. At that point, K.K. made no further physical attempts to stop him from having sex with her, testifying that "if I was to continue fighting him, then I could have gotten hurt worse with him physically hitting me." She testified further, "[I]t was either give up and let [Franks] do whatever he wanted or there was always going to be repercussions," which always involved her getting hurt, screamed at, or "forced anyway."

Franks argues that the State presented no credible evidence of K.K.'s lack of consent, but when issuing its verdict, the district court made an explicit finding that K.K.'s testimony was credible. Determinations of the weight and credibility of evidence are matters for the fact finder and not this court. See *State v. Sinkey*, 303 Neb. 345, 929 N.W.2d 35 (2019). Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of first degree sexual assault beyond a reasonable doubt. Accordingly, Franks' argument to the contrary fails.

*Excessive Sentence.*

Franks asserts that the district court abused its discretion by imposing an excessive sentence. Franks was convicted of first degree sexual assault, a Class II felony, and sentenced to imprisonment for 40 to 50 years. § 28-319(2). Class II felonies are punishable by 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). This sentence was within the statutory limits. Although Franks does not address any argument to the appropriateness of the sentences for

his convictions for two counts of third degree domestic assault, we observe that Franks' consecutive 1 year sentences for these Class I misdemeanors were also within the statutory limits. § 28-323(4); Neb. Rev. Stat. § 28-106 (Reissue 2016) (Class I misdemeanors punishable by up to 1 year's imprisonment, $1,000 fine, or both).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* However, the sentencing court is not limited to any mathematically applied set of factors. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Blaha, supra*.

A review of the presentence report shows that Franks was 45 years old at the time of the investigation. He has an associate's degree computer networking, and prior to his incarceration, he owned a business which he ran for 18 years. Franks had two previous marriages and has four dependents. Franks' criminal history includes convictions for driving under the influence and disorderly conduct for which he completed probation, driving under suspension for which he was unsatisfactorily released from probation, and various traffic offenses. Franks was administered a number of tests during the presentence investigation. He scored in the low risk category for recidivism on both the Vermont Assessment of Sex Offender Risk-2 and the Sex Offender Treatment Intervention and Progress Scale tests. However, his overall score on the Level of Service/Case Management Inventory was in the high risk range to reoffend. High risk domains identified in that assessment were family/marital and procriminal attitude/orientation. He scored in the medium risk level with respect to criminal history, education/employment, and leisure/recreation; and low risk with respect to companions, alcohol/drug problem, and anti-social pattern. On the adult probation Substance Abuse Questionnaire, Franks scored in the problem-max percentile for alcohol and violence.

In sentencing Franks in this case, the district court noted the nature of the attack on K.K., including the visible evidence of her physical injuries and the ripping of her corset, which the court observed was "violently removed." The court stated that it had considered Franks' letter to the court in which he characterized himself as the victim, stated that K.K. "hit him," and shifted blame. The court noted Franks' prior criminal history, including "the DUIs," an "unsatisfactory release from probation," and his prior "arrests for domestic violence," which Franks characterized as "all misunderstandings." The court also noted that Franks had been determined to be at high risk to reoffend and in the "pre-contemplative stage of change." The court stated that in fashioning an appropriate sentence in this case, it had looked at the presentence investigation report and materials submitted to the court, including K.K.'s statement. The court stated further:

Family members [in their submitted letters] have talked about the manipulation, the danger and the violence that they fear may come to them. And this Court can cast aside emotions and everything else along those. So I didn't take the letters as preying on the Court's emotions.

I have simply determined based upon the information received, the history, character, and condition you find yourself in, I do find that imprisonment is necessary because it's for the protecti[o]n of the public because the risk is substantial the defendant will engage in additional criminal conduct if placed under probation, and a lesser sentence would depreciate the seriousness of the offense or promote disrespect for the law.

Franks argues that the district court's sentencing decision in this case was not based on competent evidence and that it referenced irrelevant considerations. In particular, Franks complains of the court's reference to his prior arrests for domestic violence that did not result in convictions (presentence investigation report shows dismissal of "DV Assault & Battery; Amd. to: Assault & Battery" in 2007; not guilty of third degree domestic assault in 2010; and dismissal of a first offense protection order violation, also in 2010), his poor scores on some of the testing administered during the presentence investigation (without also referencing his better scores), and the numerous letters from the victim's family and friends included in the presentence report. Franks argues that these letters, which advocated for a lengthy sentence, were "an attempt to submit evidence to the court of [his] purported past wrongdoings, despite no corresponding evidence being entered on the record during the trial." Brief for appellant at 9. Franks also references, as evidence of "how the court's emotions took priority over an objective," the court's comments in sentencing him in another case (involving Franks' plea of no contest to one count of abandonment or cruel neglect of an animal) that was joined with the present case for sentencing hearing. Brief for appellant at 10. Franks acknowledges that the animal cruelty case is a separate case, but he argues that the court's reliance on information in the presentence report in sentencing him in that case "is useful in further establishing the improper considerations of the sentencing judge" in sentencing him in the present case. Brief for appellant at 10.

A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed, and evidence may be presented as to any matter that the court deems relevant to the sentence. *State v. Thieszen*, 300 Neb. 112, 912 N.W.2d 696 (2018), *cert. denied* ___ U.S. ___, 139 S. Ct. 609, 202 L. Ed. 2d 440. The traditional rules of evidence may be relaxed for this purpose, so that the sentencing authority can receive all information pertinent to the imposition of sentence. See *State v. Hunnel*, 290 Neb. 1039, 863 N.W.2d 442 (2015). Thus, reliance upon hearsay information in a presentence investigation is not inappropriate. See *id.* The court may consider reports of probation officers, police reports, affidavits, and other information almost without limitation as long as it is relevant to the issue of sentencing. See *State v. Jones*, 254 Neb. 212, 575 N.W.2d 156 (1998), *disapproved on other grounds, State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998). A sentencing court in noncapital cases may consider a defendant's nonadjudicated misconduct in determining an appropriate sentence. *State v. Meehan*, 7 Neb. App. 639, 585 N.W.2d 459 (1998). The district court's consideration of the information found within the

presentence report was proper, and we do not see that the court relied unduly on any of the items discussed in Franks' brief.

Our review of the record shows that the court did not abuse its discretion in considering the relevant factors and did not impose excessive sentences. Accordingly, we affirm Franks' sentences following his convictions for one count of first degree sexual assault and two counts of third degree domestic assault.

## CONCLUSION

The evidence was sufficient to support Franks' convictions. The district court did not abuse is discretion in sentencing Franks and did not impose an excessive sentence. Franks did not allege deficient performance by his trial counsel with enough specificity for this court to address his assignment of error regarding ineffective assistance of trial counsel.

AFFIRMED.